(No. 6224.   February 21, 1936.)

WILLIAM P. WHITE, JOE NEAULT, L. GEORGE KING and JOHN GOLSONG, Appellants and Cross-Respondents, v. CONSTITUTION MINING AND MILLING COMPANY, a Corporation, Respondent, LEWIS C. WILSON, Respondent and Cross-Appellant, and E. I. DuPONT DE NEMOURS & COMPANY, INC., a Corporation, Respondent.

[55 Pac. (2d) 152.]

404

Therrett Towles and James E. Gyde, Sr., for Appellants and Cross-Respondents.

James A. Wayne, for Respondent and Cross-Appellant Lewis C. Wilson and Respondent E. I. DuPont De Nemours & Company.

Whitla & Knudsen, for Respondent Constitution Mining & Milling Company.

Hawley & Worthwine, on Petition for Rehearing, for Respondent and Cross-Appellant Lewis C. Wilson.

BUDGE, J.—The appeals herein seek to determine the priorities in certain property of the Constitution Mining and Milling Company, hereafter referred to as the mining company, as between labor lien claimants, White, Neault, King and Golsong, and an attaching creditor, Wilson.

Chronologically stated, the facts leading up to the time of the taking of the appeals in the instant suit disclose the following situation: The mining company was the owner of mining property in the Coeur d'Alene Mining District in Shoshone County, consisting of a group of contiguous, patented and unpatented mining claims, worked as a unit, with 11,000 feet of underground workings, the whole fully equipped with ore hoists, skips, cages, pumps, compressors, ore cars, locomotives, tramway, crushers, ball mills, thickening tanks, surge tanks, flotation machines, filters, loading equipment, motors, carpenter shop, sawmill, bunk houses, offices, dams, tanks, flumes, and innumerable items of small tools, supplies and equipment for the operation of such a mine.

Prior to July 1, 1930, the mine was actively producing and shipping lead, zinc and silver ore concentrates and employed from seventy to seventy-five men, at which time White was general manager and superintendent in charge of the property. The latter part of June, 1930, production ceased because of a shortage of funds and low silver prices and White at this time tendered his resignation to the president, director and large stockholder of the mining company, Jay P. Graves.

In order to retain a working nucleus and to promote a speedy resumption of production in the future, and to keep

the property and mine preserved and protected and in a workable condition, Graves, president of the mining company, made arrangements for the employment of White, Neault, King and Golsong commencing with July 1, 1930. White was employed on the basis of $500 per month, $300 to be paid in cash and the balance to be deferred until such time as the mine could be refinanced or development and production resumed. White, under instructions from Graves, employed Neault on the basis of $225 per month, $100 cash, balance deferred; Mr. King, $225 per month, $125 cash, $100 deferred; Golsong, $200 per month, $100 cash, $100 deferred.

Wilson brought suit against the mining company on assigned merchandise accounts, aggregating $20,000 on October 8, 1930, and an attachment was levied in such suit on the property of the mining company on October 9, 1930.

On January 31, 1933, claims of lien were filed for record by White, Neault, King and Golsong for unpaid salaries under the before-mentioned employment agreements. The present suit, to foreclose the liens of White, Neault, King and Golsong, was filed July 24, 1933.

Judgment was delayed in the Wilson suit for some time with the object in view that the mining company might be able to refinance itself, until on August 3, 1933, when judgment was entered, and on August 22, 1933, an execution was issued on this judgment. Negotiations had been and were being carried on between the directors of the mining company and certain foreign interests, looking to the refinancing of the mine, and with what appeared to be to all parties some degree of success and in which event all indebtedness of the mining company would be liquidated and operation resumed.

September 1, 1933, intervener E. I. DuPont De Nemours & Company recovered a judgment against the mining company and thereafter on September 25, 1933, an execution was caused to be issued and the sheriff levied on all the property of the mining company.

All of the property of the mining company was sold at sheriff's sale under the Wilson judgment to Wilson on October 6, 1933. On October 20, 1933, the property of the mining company was sold at sheriff's sale under the DuPont judgment to such company. There being no redemption from the

first sheriff's sale, namely, that to Wilson, sheriff's deed issued to Wilson on October 7, 1934.

In the present action, instituted by White, Neault, King and Golsong against the mining company and Wilson to foreclose their claims of lien, Wilson answered and the DuPont company intervened, and the foregoing facts, with considerable detail, were alleged by the various parties.

Upon the trial of the instant action the court awarded a judgment to White, Neault, King and Golsong against the mining company for the amount that each claimed, together with costs and attorneys' fees, this judgment being by default as against the mining company. The court decreed that no part of White's judgment was lienable and that no part of it was prior to the Wilson judgment, the DuPont judgment, or the judgments of Neault, King and Golsong. The court further decreed that that part of the judgment awarded Neault, King and Golsong, covering wages earned between July 1 and October 9, 1930, that is for all wages for work performed prior to the Wilson attachment, was a lien upon all the property of the mining company, superior to the Wilson judgment, but, that the balance, for wages for work performed after the Wilson attachment was inferior to the Wilson judgment, and that the whole of the judgments awarded Neault, King and Golsong, were superior to the claims of White and the intervener DuPont.

The lower court in its findings, among other things, and after describing the various claims, machinery, tools and equipment of the mining company found the following:

"That the said mining company was the owner or reputed owner of the above described property from the first day of July, 1930, until the 6th day of October, 1933, and that prior to said period the mining company has operated said mine as a contiguous group or unit and that all the property above described is and was essential and necessary to the ordinary working operation and development and enjoyment of said mine."

The court further found with respect to Wilson:

"That the delay between the date of the issuing of the attachment and the reduction of said claim to judgment was occasioned by the different requests of the defendant mining company for time as it desired an opportunity to refinance

the mine and that the same could not be done if the same was reduced to judgment and receive any publicity; that the said defendant, Lewis C. Wilson, in the prosecution of his said action against the mining company, was not guilty of latches, nor *was* the attachment proceedings abandoned.''

With reference to the employment of White, Neault, King and Golsong the court found as follows:

'' .... the president of said mining company, J. P. Graves, desired to retain a nucleus of an organization for the further operation of its mine when the price of metal had advanced so that they could operate without loss or the mining company *were* refinanced, were employed by the said mining company on the following terms and conditions:

''William P. White to be the superintendent and manager in looking after and taking care of said property and that the other three plaintiffs were to perform services and do work as laid out and determined by this plaintiff .... plaintiff's pay was temporarily reduced to $200.00 per month for the reason that, during said time, by and with the consent of the mining company, this plaintiff was employed at the Hope mine, near Clarksfork, in Bonner County, State of Idaho, and was absent from the mine continuously during said period except that the plaintiff returned to the Constitution mine at intervals of once or twice per week during which periods this plaintiff personally planned and mapped out the work for the other plaintiffs and inspected the property for the purpose of determining that the mine was being properly cared for and preserved. .... That this plaintiff performed services for the mining company from the period of July 1st, 1930 to the 31st day of December, 1932, and that there became due this plaintiff from the said mining company, for salary or wages, the sum of $12,900.00 against which there is a credit in the sum of $1625.00, leaving the balance due and payable by the mining company to this plaintiff, the sum of $11,275.00. ..... the court finds that for the services performed by this plaintiff for the said mining company, he is not entitled to a lien. .... ''

With reference to Neault, King and Golsong, the court found:

"That the three other plaintiffs herein, Joe Neault, L. George King and John Golsong, were employed on the following terms: For the purpose of keeping the machinery in repair, pumping water from the mine, operating machine shops and for the purpose of keeping the machinery in working order, operating hoists and doing any and all necessary work to keep the mine machinery, tools and equipment in first class condition so that work could be resumed in the mine on short notice, that the plaintiff, Joe Neault, for his services, commencing on the 1st day of July, 1930, and ending on the 31st day of December, 1932, was to receive the sum of $225.00 per month including house and fuel and that there became due to this plaintiff for his labor and services the sum of $6750.00 with a credit thereon in the sum of $2175.00, leaving the amount due to this plaintiff the sum of $4575.00."

There are findings similar to the last quoted which refer to King and Golsong, and the court likewise found that each of the plaintiffs filed claims of lien on January 31, 1933.

As a conclusion of law the court recited the following with reference to White:

"That the plaintiff, William P. White, is entitled to a judgment against the defendant in the sum of $11,275.00 . . . . but is not entitled to any lien against the property of the defendant, Constitution Mining Company and that his judgment is inferior to the judgment of the intervener, DuPont Company, the claim of Lewis C. Wilson and the claims of Joe Neault, L. George King and John Golsong."

With reference to Neault, King and Golsong the court concluded similar to the following in each instance:

"That the plaintiff, Joe Neault, is entitled to a judgment foreclosing his lien against the defendant, Constitution Company, . . . . That the said lien, in the sum of $5708.72 is superior to the claim of the intervener, DuPont Company and William P. White; that of said judgment, on that part of his claim of lien, which accrued between the 1st day of July, 1930 to October 9th, 1930, is superior to the claim of Lewis C. Wilson which, in amount, is the sum of $440.32, together with the sum of $100.00 as attorneys fees and $2.00 for the cost of recording the lien, together with interest thereon at 6% from the 1st day of April, 1933 to date

hereof, making an aggregate amount of $584.15. That the balance of said claim of the said Joseph Neault is inferior to the claim of Lewis C. Wilson.''

Intervener DuPont has taken no appeal. Appellants White, Neault, King and Golsong appeal from that part of the judgment holding and decreeing that their judgment was, in whole (White) and in part (King, Neault and Golsong), inferior to the judgment of Wilson and DuPont Company, specifying as error all parts of the findings, conclusions and judgment which are contrary to their contention of superior liens for the full time employed. Wilson appeals from that part of the judgment against him, specifying as error that:

''The court erred in holding, deciding, finding and decreeing, that any part of the judgments awarded to the plaintiffs Joe Neault, L. George King and John Golsong against the defendant Constitution Mining and Milling Company were a first lien upon the property of said company superior to the judgment of the defendant Lewis C. Wilson.''

While there are many specifications and particulars of error contained in the brief of White, Neault, King and Golsong, these assignments, together with the error assigned by Wilson, raise two general questions: First, whether or not the lien claim of White was on a par with, and thus entitled to the same preference, if any, as the claims of Neault, King and Golsong. Second: Whether or not the lien claims and judgments of Neault, King and Golsong (and likewise White if on a par with them) are superior to the attachment and judgment of Wilson in any part, in only that part decreed by the trial court, or as to the whole amount of such lien claims and judgments.

For the purpose of avoiding confusion, certain facts have not been related in the foregoing statement of the facts but will be set forth hereinafter in connection with the discussion of the particular question to which they have specific application.

Specifications of error Nos. 1, 4, 8 and 11 (d) and specifications of particulars Nos. 3, 4, 8 and 9 (a) and (b) are directed against the denial by the lower court of any lien against the property of the mining company for the

services performed by White at the mine, and raise the question of whether White was entitled to a lien on a par with that of Neault, King and Golsong. The finding with relation to the duties and services performed by White is very brief, reciting as follows:

"William P. White to be the superintendent and manager in looking after and taking care of said property and that the other three plaintiffs were to perform services and do work as laid out and determined by this plaintiff."

The uncontroverted evidence discloses that White was neither a director nor an executive officer of the company and that the position of general manager, general superintendent or general agent of the mining company was not handled by White but rather by Mr. Graves, the president, from whom White took his instructions, doing the work he was instructed to do. It appears that White's duties were to inspect the mine, personally plan the work to be done by the men, inspect the work and help with the work when necessary. It appears that he worked with the men and alone; he worked with the men in cleaning the compressor after a landslide and personally planned and directed and superintended the work of the others and helped with the work when necessary. It appears that the mining property included twenty-three unpatented mining claims and that White opened cuts and prospected for the vein which had been faulted and performed assessment work on the surface and underground. There was evidence of actual manual labor being performed by White, both alone and with the others, in addition to the fact that he personally planned, directed and superintended the work of the men and inspected the mine and the work performed. I. C. A., sec. 44–501, provides in that part material herein as follows:

"Every person performing labor upon, . . . . or who performs labor in any mine or mining claim, has a lien upon the same for the work or labor done, . . . . whether done . . . . at the instance of the owner of the building or other improvement or his agent. . . . . "

The question of what is meant by the performance of "labor upon" or "labor in any mine or mining claim" in this jurisdiction appears to have been first spoken of in

*Lockhart v. Rollins,* 2 Ida. 540, 21 Pac. 413, where the court used it as an analogy, saying:

"The question as to what shall be understood as 'labor upon mines,' buildings, etc., has been much discussed, in cases of mining claims; more frequently, perhaps, in cases of lien for labor done. The cases have mostly arisen under claims for miners' or mechanics' liens. While the words of the various statutes are not always identical, there is a general uniformity in the words used in these laws with the statute requiring this annual labor upon mining claims. Practically, where the claim is for work done, the statutes require it to be done on the property. The case of *Rara Avis etc. Min. Co. v. Bouscher,* 9 Colo. 385, 12 Pac. 433, decides what shall constitute labor done 'in or upon' mining claims, under the lien law of that state. The law (Colo. Gen. Laws, sec. 1655) reads: 'All miners, laborers, and others, who work or labor in or upon any mine,' etc., 'shall have a lien,' etc. The court held that the services of a superintendent of mines, in planning or superintending the erection of a mill, and machinery, are work or labor, in or upon the property, within the meaning of the statute. So in Utah (Comp. Laws, sec. 1221) one who shall do work 'upon any mine shall be entitled,' etc. In a case founded upon this statute (*Flagstaff Silver Min. Co. v. Cullins,* 104 U. S. 176 [26 L. ed. 704]) the court says: 'It is somewhat difficult to draw the line between the kind of work and labor which is entitled to a lien and that which is merely professional or supervisory employment, not fairly to be included in those terms. Some courts have held, under laws similar to those of Utah, that an architect who furnished plans, and superintends the erection of a building, acquires a lien thereon for work and labor'; and cite *Stryker v. Cassidy,* 76 N. Y. 50, 32 Am. Rep. 262, and note; *Mutual Ben. Life Ins. Co. v. Rowland,* 26 N. J. Eq. 389, and other cases. In that case the claimant of the lien was an overseer and foreman of a body of miners, and his claim was held good. If it be said that these cases go rather to what shall be deemed work, we answer that it is precisely the case at bar. There can be no question that whatever was done was done on plaintiff's claim."

In *Thompson v. Wise Boy Min. etc. Co.*, 9 Ida. 363, 74 Pac. 958, this court again considered the type of work lienable with reference to mines and mining claims and in effect approved the statement made in *Lockhart v. Rollins, supra:*

"The milling of the ore extracted from the mine is as valuable to the mine owner as the extraction of the ore; and where it is milled upon the mine and in a mill belonging to the mine, we see no more reason for denying the man a lien who works in the mill than for denying such a lien to the man who operates the hoist or runs the cars or handles the pick or shovel. And we are very strongly inclined to the belief that the legislature had the one in mind as much as the other when they enacted this law.

"In *Lockhart v. Rollins*, 2 Ida. 540, 21 Pac. 413, Mr. Justice Berry, speaking for this court, came as near touching upon the question involved in this case as is done in any of the cases to which we are cited. It was there held that the services of a watchman in looking after and taking care of buildings, engines, boilers, machinery, hoisting works and tools of the mine was work upon the mine within the meaning of the law; and while the question there considered was with reference to what constituted assessment work, the court in arriving at that conclusion considered and discussed many cases where liens had been sought upon mines and mining claims and treated them as analogous subjects."

In *Naylor v. Lewiston etc. Ry. Co.*, 14 Ida. 789, at 802, 96 Pac. 573, this court again considered the question of the right of a superintendent to a lien for his services, saying:

"Included in the claim of lien, also, was compensation for superintending the work. Counsel argue that no lien should be allowed for this labor. The statute, however, clearly contemplates a lien for labor performed in or upon improvements. The labor of a superintendent in the construction of works becomes a part of the improvement to the same extent as the labor of any other individual, and establishes his right to a lien the same as that of any other person who performs labor upon or in said work. (*Thompson v. Wise Boy Min. etc. Co.*, 9 Ida. 363, 74 Pac. 958.)"

The foregoing statement is again quoted in deciding the same point in *Hill v. Twin Falls etc. Water Co.*, 22 Ida. 274,

125 Pac. 204, and *Thompson v. Wise Boy Min. etc. Co., supra,* is quoted with approval upon the point involved in *Chamberlain v. City of Lewiston,* 23 Ida. 154, 129 Pac. 1069. The Circuit Court of Appeals, Ninth Circuit, considering the lien statutes of Idaho in *Idaho Min. & Mill. Co. v. Davis,* 123 Fed. 396, determined as follows with respect to the services of a foreman and watchman:

"From this it appears that the plaintiff entered into the employ of the defendant mining company as foreman, on August 1, 1887, at $150 per month, and that he remained in such employ, in some capacity, until the time of bringing the present suit. . . . . From the plaintiff's own testimony it is apparent that his duties were merely those of a watchman and caretaker after the year 1889; but the exact time of the change of employment, owing to the discontinuance of active work at the mine, is not clearly ascertained. . . . .

"The statutes giving liens to laborers and mechanics for their work and labor are liberally construed (*Davis v. Alvord,* 94 U. S. 545, 24 L. ed. 283), and, the plaintiff's position with respect to the mine not being professional or supervisory to the degree that would preclude him from the benefits of a lien, in our opinion the duties he performed were such as to entitle him to a lien upon the property. (*Flagstaff Silver Min. Co. v. Cullins,* 104 U. S. 176, 26 L. ed. 704.)"

In *Southeastern Alaska Min. Corp. v. Zavodsky,* 60 Fed. (2d) 24, the Circuit Court of Appeals, Ninth Circuit, says:

"We come then to the question as to whether a person employed as caretaker or watchman of a mining claim, or of property thereon located, is among those permitted under the terms of the Alaska law of 1915 to enforce a lien to secure payment of money due him. . . . . Mr. Lindley, in his work on Mines, volume 2 (3d Ed.) p. 629, states that the wages paid to a watchman employed 'to take care of and protect mining property while it is idle have been held to satisfy the law as to annual expenditures; . . . . He cites *Lockhart v. Rollins,* 2 Ida. 540, 21 Pac. 413. If, as this author states, the work of a watchman is of such a character as to satisfy assessment requirement, surely that character will bring it within the Alaska statutes as being a class of work 'in or about a mine or mining claim necessary or convenient to the development, operation,' etc.

"The District Judge found that on the claims of appellant there was mining machinery, all of which was necessary or convenient to the development and operation of the mine, and that the employment of Fremming was necessary to preserve that property . . . . The fact that work had been suspended does not in our opinion, restrict the application of the lien statute. It can be assumed that the very purpose of the employment by appellant of Fremming was to have the property guarded and protected until such time as mining operations might be resumed. The statute, in no part of it, makes it a condition to the assertion of a lien that mining shall be in active progress."

In *Riggen v. Perkins,* 42 Ida. 391, 246 Pac. 962, on rehearing, this court cited and quoted from *Durkheimer v. Copperopolis Copper Co.,* 55 Or. 37, 104 Pac. 895, upon another point and of the case said:

*"While not meaning to determine, as the Durkheimer case does, that a superintendent or manager does not have a lien as a 'person performing labor,'* the reasoning is especially persuasive as to the intent of such acts, in distinguishing laborers and a person or corporation furnishing labor."

A case apparently similar to the instant one in point of fact is that of *Flagstaff Silver Min. Co. of Utah v. Cullins,* 104 U. S. 176, 26 L. ed. 704, wherein the United States Supreme Court said:

"The finding of the district court makes clear the character of the services rendered by defendant in error. He was not the general agent of the mining business of the plaintiff in error. That office was filled by Patrick. He was not a contractor. The services rendered by him were not of a professional character, such as those of a mining engineer. He was the overseer and foreman of the body of miners who performed the manual labor upon the mine. He planned and personally superintended and directed the work, with a view to develop the mine and make it a successful venture. He appears from the findings to have performed duties similar to those required of the foreman of a gang of track hands upon a railroad, or a force of mechanics engaged in building a house. Such duties are very different from those which belong to the general superintendent of a railroad, or the

contractor for erecting a house. Their performance may well be called work and labor; they require the personal attention and supervision of the foreman and occasionally in an emergency, or for an example, it becomes necessary for him to assist with his own hands. Such duties cannot be performed without much physical exertion, which, while not so severe as that demanded of the workmen under the control of the foreman, is nevertheless, as really work and labor. Bodily toil, as well as some skill and knowledge in directing the work is required for their successful performance. We think that the discharge of such duties may well be called work and labor, and that the district court rightfully declared the person who performed them entitled to a lien, under the law of the Territory.''

Other authorities reaching conclusions similar to the foregoing are as follows: *Sutton v. Cons. Apex Min. Co.,* 15 S. D. 410, 89 N. W. 1020; *Pendergast v. Yandes,* 124 Ind. 159, 24 N. E. 724, 8 L. R. A. 849; *McLaren v. Byrnes,* 80 Mich. 275, 45 N. W. 143; *Washburn v. Inter-Mountain Min. Co.,* 56 Or. 578, 109 Pac. 382, Ann. Cas. 1912C, 357; *Palmer v. Uncas Min. Co.,* 70 Cal. 614, 11 Pac. 666; *Rara Avis Gold etc. Min. Co. v. Bouscher,* 9 Colo. 385, 12 Pac. 433; *Capron v. Strout,* 11 Nev. 304; 40 C. J., sec. 845, p. 1166.

The finding made by the court with reference to White's employment, although brief, is not out of harmony with facts nor with the conclusion reached here, the finding being to the effect that White was employed in looking after and taking care of the property and that he personally planned, mapped out, laid out and determined the work to be performed at the mine, and inspected the property for the purpose of determining that the mine was being properly cared for and preserved. It does not appear that White's services were of a professional or supervisory character, as might be without the terms or meaning of the statute. Under the proof submitted on White's behalf, to all intents and purposes, he performed labor upon or in the mine or mining claim and was entitled to a lien on a par with that of King, Neault and Golsong, and the lower court was therefore in error in concluding to the contrary.

Appellants' (White, Neault, King and Golsong) specifications of error Nos. 4, 5, 6, 7 and 11 (a), (b), (c) and (d) and their specifications of particulars, 3, 4, 5, 6, 7 and 9 (a) are to the effect that the court erred in denying to them any lien for labor after the levy of the Wilson attachment. On the other hand Wilson under his specification of error urges that these appellants are not entitled to liens in any amounts upon any of the property of the mining company for the following reasons: (1) That the property was not subject to lien, and that property which may have been subject to lien was not segregated from nonlienable property; (2) because there is an effort to claim a lien for work of a character not lienable, and that the lienable work is not segregated from nonlienable; (3) because the liens were not filed within the statutory time after completion of work, it being urged that October 9, 1930, the date of the attachment, the property passed into the custody of the law, was not subject to lien thereafter, and that the liens were filed January 31, 1933; and (4) because there was a break in the continuity of employment of plaintiffs White and King. The foregoing specifications and particulars all go to the general question of whether or not appellants White, Neault, King and Golsong, were entitled to a lien, the extent of such lien, and whether any such liens had been lost, which questions may be considered together.

It is urged by Wilson that the liens of the claimants are invalid because their claims included timber claims not subject to a lien of this character, upon mining claims which would be subject to lien under certain conditions, and, upon property claimed by plaintiffs as personalty and not subject to lien under I. C. A., sec. 44–501, and without segregating the work performed upon any of these particular items of property. The undisputed evidence is that the work performed and for which the liens were claimed consisted of re-timbering in the mine, work on the pumps and hoists, on machinery in the mill, on the pipe lines and flumes, buildings and wagon road and in prospecting on the surface and other such work. It also appears that the mining property consisted of twenty-three unpatented and twenty-one patented mining claims, all in one unit (*Phillips v. Salmon River*

*Min. etc. Co.,* 9 Ida. 149, 72 Pac. 886; *Thompson v. Wise Boy M. & M. Co., supra; Salt Lake Hdw. Co. v. Chainman M. & E. Co.,* 137 Fed. 632) and adjacent to each other and a few timber claims in connection therewith, and that all of the improvements, either on the surface or underground and upon which the work was performed, were on the patented mining claims. The claimants concede in their brief that their liens should be fixed only against the mining claims and the appurtenances and urge that they took such position at the trial and upon the hearing to determine what should be contained in the findings and decree. It does not appear that there was any fraudulent intent, nor that anyone was injured due to the fact that the lien claims may have included more property than necessary or property other than that actually subject to lien. The fact that the notice of a claim of lien or claim or statement describes or includes more than the party is entitled to a lien on does not invalidate nor defeat the lien as to the land or property properly subject thereto, if there is no fraudulent intent and no one is injured thereby, and it is for the court to determine, after hearing all the evidence in the case, what portion of the property shall be subject to the lien. (40 C. J., sec. 266; *Northwestern etc. Pavement Co. v. Norwegian Seminary,* 43 Minn. 449, 45 N. W. 868; *Maynard v. Ivey,* 21 Nev. 241, 29 Pac. 1090; *Malone v. Mining Co.,* 76 Cal. 578, 18 Pac. 772; *Western Iron Works v. Montana Pulp & Paper Co.,* 30 Mont. 550, 77 Pac. 413; *Cary Hdw. Co. v. McCarty,* 10 Colo. 200, 50 Pac. 744.)

The lien claimants contend that the labor which they performed on the property of the mining company was done under a continuing contract; that it related back to the commencement of the work and that their liens for such labor are prior to the attachment lien of Wilson. In other words, that they are entitled to a lien prior to the lien of the Wilson attachment for the full length of time they performed labor for the mining company upon the mine or mining claims. The general rule appears to be well settled that the liens of mortgages, deeds of trust, judgment and other encumbrances, including attachments, created subsequent to the time when the labor lien attaches, or subse-

quently to the time to which the labor lien relates, are subordinate to the liens of claimants for work or labor performed. I. C. A., sec. 44-506, provides for the preference of labor liens as follows:

*"The liens provided for in this chapter are preferred to any lien, mortgage or other encumbrance, which may have attached subsequent to the time when the building, improvement or structure was commenced, work done, or materials were commenced to be furnished; also to any lien, mortgage, or other encumbrance of which the lien holder had no notice, and which was unrecorded at the time the building, improvement or structure was commenced, work done, or materials were commenced to be furnished."*

"The lien, if any exists at all, relates back to the date of the commencement of the work or improvement or the commencement to furnish the material." (*Mine etc. Co. v. Idaho Mines Co.,* 20 Ida. 306, 118 Pac. 301; *Pacific States etc. Co. v. Dubois,* 11 Ida. 319, 83 Pac. 513.)

See also: *Poynter v. Fargo,* 48 Ida. 271, 281 Pac. 1111; *Boise-Payette Lumber Co. v. Halloran-Judge Trust Co.,* 281 Fed. 818; *Continental etc. Trust etc. Bank v. Corey Bros. Constr. Co.,* 208 Fed. 976; Bloom, Law of Mechanics' Liens and Building Contracts, p. 455, sec. 495, and cases cited in note; 6 C. J., sec. 548, p. 288; 40 C. J., p. 1179, sec. 876.

The court in the instant case allowed the claimants Neault, King and Golsong a lien for the work performed prior to the date of the levy of the Wilson attachment, but refused a lien for the labor performed after the levy of the Wilson attachment. The court specifically found that White, Neault, King and Golsong "were employed by the said mining company" on the following terms and conditions:

"William P. White to be the superintendent and manager *in looking after and taking care of said property* and that the other three plaintiffs were to perform services and do work as laid out and determined by this plaintiff."

and further found that White "performed services for the mining company from the period of July 1, 1930, to the 31st of December, 1932." Likewise with respect to Neault, King and Golsong, the court found that each of them performed services for the mining company from July 1, 1930, to the

31st of December, 1932, and stated the terms and conditions of their employment in the following language:

"Joe Neault, L. George King and John Golsong were employed on the following terms: For the purpose of keeping the machinery in repair, pumping water from the mine, operating machine shops and for the purpose of keeping the machinery in working order, operating hoists and doing any and all necessary work to keep the mine machinery, tools and equipment in first class condition so that work could be resumed in the mine on short notice."

The court likewise determined that each was entitled to recover for "services, commencing on the 1st day of July, 1930, and ending on the 31st day of December, 1932." There is sufficient evidence in the record to support the findings of the court in the foregoing respects. In these findings the lower court treated the employment of White, King, Neault and Golsong as being one employment or one transaction for the whole term, or as employment for the period from July 1, 1930, to December 31, 1932, and for the one purpose of keeping the machinery repaired and in working condition and all the property preserved and in first-class condition in order that active production could be resumed in the mine on short notice. It appears that there was but a single hiring of Golsong, King, Neault and White, that occurring before they commenced work on July 1, 1930, and under which they continued to work thereafter until December 31, 1932. No definite time was set for that employment to terminate. There was one contract of employment for a particular purpose and with the accomplishment of one object or purpose in view, namely: to preserve and maintain the mine in first-class condition while it was not actively producing and shipping ore concentrates. The work of the claimants was continuous and all related to the one transaction, that of their employment on July 1, 1930, to preserve and keep the property in first class condition. No attempt was made to terminate this employment either by the mining company or by Wilson. In *Mines etc. Co. v. Idaho etc. Mines Co.*, 20 Ida. 300, 118 Pac. 301, a mining company had an open and running account with a mine and smelter supply company, and for the purpose of procur-

ing materials and supplies in order to construct mills and equipment for the operation of the mine they made arrangements whereby the mining company should have an extended credit sufficient to cover the materials and supplies. Therein, Ailshie, J., speaking for the court, said:

"It seems to us that this transaction may properly fall within the rule suggested by the supreme court of Utah in *Fields v. Daisy Gold Mining Co.*, 25 Utah, 76, 69 Pac. 528, wherein the court said: 'In general, we consider the proper rule to be that, when all the items in the account relate to one continuous transaction between the same parties, although the goods were delivered on separate orders, and at different dates, within short intervals of each other, and the dealings of the parties indicate an expectation to continue such business relations, the transactions constitute a continuing running account, regardless of intervening irregular monthly balances in the account, which dates from the last item delivered, and relates back to the time of the first delivery of material under that course of dealing or contract shown. This presumption may be overcome and rebutted by the nature and course of dealing by the parties or by facts shown. If the materials were furnished for separate and distinct purposes under distinct separate contracts or orders requiring cash payment under circumstances tending to rebut dealings of a continuous nature, then there would be no presumption of a continuous account, and in the absence of an express contract, a right for a lien, if any, would date from the time of the commencement to furnish materials for the different separate contracts on each separate order.' (See *Valley Lumber Co. v. Driessel*, 13 Ida. 680, 93 Pac. 771, 15 L. R. A., N. S., 229, opinion on petition for rehearing.)"

In *Nason v. Northwestern Milling & Power Co.*, 17 Wash. 142, 49 Pac. 235, it is determined that the mere fact that one performing lienable work under an entire contract is paid by the month does not prevent his lien from attaching from the date of the first work, the court saying:

"It is also urged that the respondent's claim for lien is based upon services rendered under an employment from month to month, and that all work done by him subsequent to the recording of appellant's mortgage was performed

under contracts made by him after legal notice of appellant's rights, and his lien therefore is subordinate to appellant's mortgage. We think it is apparent from the record that the contract of employment was an entirety, and contemplated not only the drawing of plans, but superintending the construction of the building to completion; and the fact that under it, compensation was to be made by the month, does not affect the contract. Phil. Mech. Liens, sec. 229, and authorities there cited.''

In *Ah Louis v. Harwood,* 140 Cal. 500, 74 Pac. 41, the court said:

''We see no reason why the compensation to be paid the laborer may not be contracted for by the month as well as by the day, and when by the month it has been held that it was not necessary to file the notice of the lien, within 30 days from the end of each month, and inferentially at least, the point now raised was held adversely to appellants' contention. *Malone v. Big Flat Gravel M. Co.,* 76 Cal. 578, 18 Pac. 772. The statute gives the lien for the work done. The method by which the compensation to be paid is measured is immaterial. It may be by fixing an amount per day, week, or month, and, if continuous as it was in this case, the contract would govern. The employment does not terminate at the end of each month.''

It not only appears that the workmen continued on in their work upon the mine in continuation of the contract of employment made immediately preceding July 1, 1930, but it appears that the actions of Wilson may have had considerable bearing upon the fact that they continued after the attachment was levied by Wilson, and which tended to show, not only that Wilson did not attempt to terminate the employment of the claimants but was in favor of their continuing, but likewise tended to show a continuing employment under the contract of July 1, 1930. It was known to Wilson that these laborers were working in and at the mine to the end that it be preserved and kept in first-class condition. As one of the conditions in delaying taking of judgment by him Wilson stipulated and insisted that the mine be kept in the same condition it was at the time the attachment was levied. That is, that all the electrical machinery be kept in such

condition that the plant could be started up immediately upon resumption of work; that the pumps should be kept in operation to keep the mine free of water; that timbering be replaced and added to where and when necessary; that the sawmill should be kept in condition to furnish the necessary material to be used; that assessments should be performed and properly recorded; and that all other things should be done in order that there be no deterioration or loss in value of the mining property. It appears that $5,000 was paid on April 3, 1931, to be credited on the accounts sued upon by Wilson and on April 4, 1931, the following letter was written by Wilson's attorney, a copy of which letter was introduced in evidence as Defendant's Exhibit "B":

"April 4, 1931.

"Mr. B. H. Kizer,

"Sec. Constitution M. & M. Company.,

"Spokane, Washington.

"Dear Sir;—

"Referring to the case of Lewis C. Wilson against the Constitution Mining & Milling Company. The accounts on which this suit was brought are Coeur d'Alene Hardware & Foundry Company $13,958.51, Wallace Powder Company $627.37 and Rossi Insurance & Investment Company $5766.54, these amounts being only the principal sums without interest or costs of suit.

"On April 3, 1931, we received and credited on these accounts a partial payment of $5,000.00 which payment was accepted with the understanding that the suit, the attachment and the lien of said attachment, will remain *in status quo* until December 31, 1931, that you will preserve the mine and mining property in good, workable condition so that the same may not deteriorate during this time, that you will perform the annual assessment work on the unpatented claims that are valuable to the property, and with the further understanding that if possible you will make further payments on the claims involved in this suit, during the time above mentioned.

"Yours very truly,

"JAW/MS."

It would require no strength of imagination to say that the continued employment of the laborers was equally as much at the instance and request of Wilson as it was of the mining company. We are constrained to the view that there was a continuing contract of employment, commencing with July 1, 1930, and ending December 31, 1932. Under such a contract, by the terms of the statute and in view of the decisions heretofore referred to, the liens of White, King, Neault and Golsong were not affected by the attachment of Wilson, but were superior thereto in the whole amount thereof.

We are further of the view that there is sufficient evidence to support the court's finding that there was no such break in the continuity of King's employment as to destroy his lien in any part thereof.

With reference to White it would appear that the same conclusion must be reached. The court found and the finding is supported by the evidence that:

. "For the months of February to August, 1931, inclusive, plaintiff's pay was temporarily reduced to $200.00 per month for the reason that, during said time, by and with the consent of the mining company, this plaintiff was employed at the Hope Mine, near Clarksfork, in Bonner County, State of Idaho, and was absent from the mine continuously during said period except that the plaintiff returned to the Constitution mine at intervals of once or twice per week during which periods this plaintiff personally planned and mapped out the work for the other plaintiffs and inspected the property for the purpose of determining that the mine was being properly cared for and preserved."

It does not appear that there was any new contract of employment, but rather that White continued to perform the same kind of services and labor as formerly, except that the hours of labor were reduced during the period, and in effect there was no break in the continuity of the employment of July 1, 1930.

The foregoing disposes of the case and makes unnecessary the determination of other questions which may have been raised by the parties.

It follows that the judgment of the trial court must be reversed and modified, and remanded to the trial court for

the purpose of making findings, conclusions and entering judgment in accordance with the views herein expressed. Costs awarded to appellants King, Neault, White and Golsong.

Givens, C. J., and Holden, JJ., concur.

Morgan, J., dissents.

Ailshie, J., did not sit at the hearing and took no part in the decision of this case.

Petition for rehearing denied.